**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **PYTHIAN J. JEFFRIES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:09CV 2110 SNLJ(LMB)** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying the application of Pythian J. Jeffries for Supplemental Security Income under Title XVI

of the Social Security Act. The cause was referred to the undersigned United States Magistrate

Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b). Plaintiff has filed a

Brief in Support of the Complaint. (Document Number 12). Defendant has filed a Brief in

Support of the Answer. (Doc. No. 17).

**Procedural History**

On August 8, 2007, plaintiff filed his application for benefits, claiming that he became

unable to work due to his disabling condition on April 1, 2001. (Tr. 179-80). This claim was

denied initially, and following an administrative hearing, plaintiff's claim was denied in a written

opinion by an Administrative Law Judge (ALJ), dated August 11, 2009. (Tr. 104-05, 13-23).

Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council, which was

- 1 -

denied on November 25, 2009. (Tr. 4, 1-3). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

**Evidence Before the ALJ**

**A.    ALJ Hearing**

Plaintiff's administrative hearing was held on March 5, 2009. (Tr. 37). Plaintiff was present and was represented by counsel. (Id.). Vocational expert Dr. McGrowski was present. (Id.). Also present were witnesses Natalie Ray and Mark Goens. (Id.).

The ALJ examined plaintiff, who testified that he was forty-four years of age, five-feet-eleven-inches tall, and weighed 200 pounds. (Tr. 42). Plaintiff stated that he was single and had one child who was approximately twenty-six years of age. (Tr. 43). Plaintiff testified that he lived alone in an apartment. (Id.).

Plaintiff stated that someone picked him up and drove him to the hearing. (Id.). Plaintiff testified that he had a driver's license at the time of the hearing and that he had last driven when he was sixteen. (Id.). Plaintiff stated that he was involved in an automobile accident when he was sixteen and he lost his driver's license as a result. (Tr. 44).

Plaintiff testified that his only source of income was food stamps. (Id.). Plaintiff stated that Natalie Hope with Horizon pays for his apartment. (Id.). Plaintiff testified that Mark Goens pays for his medication. (Id.). Plaintiff stated that he receives Medicaid benefits. (Tr. 45). Plaintiff testified that he has never received workers' compensation or unemployment benefits. (Id.).

Plaintiff stated that he has a ninth grade education. (Id.). Plaintiff testified that he has not obtained his GED. (Id.). Plaintiff stated that he took all special education classes in high school.

(<u>Id.</u>).

Plaintiff testified that he received a certification for working in the hotel industry. (<u>Id.</u>).
Plaintiff stated that he took a six-week-long class to earn this certification. (Tr. 46). Plaintiff
testified that he earned the certification through on-the-job training. (<u>Id.</u>). Plaintiff stated that he
was trained to buff floors, clean bathrooms, and clean rooms. (<u>Id.</u>).

Plaintiff testified that he is unable to read or write. (<u>Id.</u>). Plaintiff stated that he did not
complete the ninth grade. (<u>Id.</u>). Plaintiff testified that he is only able to read some street signs.
(Tr. 47). Plaintiff stated that he is able to write his name. (<u>Id.</u>).

Plaintiff testified that he was not working at the time of the hearing and that he had last
worked in 2002. (<u>Id.</u>). Plaintiff stated that his alleged onset of disability date is April 1, 2001.
(<u>Id.</u>). Plaintiff testified that he went to prison on that date. (<u>Id.</u>). Plaintiff explained that he
received Social Security benefits prior to entering prison and he lost the benefits when he entered
prison. (<u>Id.</u>).

Plaintiff testified that he served five years in prison for domestic assault. (<u>Id.</u>). Plaintiff
stated that his live-in girlfriend accused him of assaulting her. (<u>Id.</u>). Plaintiff testified that he
received the maximum sentence. (<u>Id.</u>). Plaintiff stated that he did not have any prior convictions.
(Tr. 48). Plaintiff testified that he took GED classes while in prison. (<u>Id.</u>). Plaintiff testified that
he had been out of prison since 2006. (<u>Id.</u>). Plaintiff's attorney noted that plaintiff was released
from prison on July 25, 2007. (<u>Id.</u>).

Plaintiff testified that he has attempted to find work in the hotel industry since being
released from prison. (Tr. 49). Plaintiff stated that Mr. Goens helped him apply for about six
positions, but he received no call-backs. (<u>Id.</u>).

Plaintiff testified that he had worked as a laborer in the past. (Id.). Plaintiff stated that he performed cleaning work in hotels. (Id.). Plaintiff testified that he used a buffer to clean floors but he did not have to lift the buffer. (Tr. 50). Plaintiff stated that he worked as a porter in a hotel in 1991. (Id.).

Plaintiff testified that he worked for Atlas Reserve Temps in 2002. (Id.). Plaintiff stated that he wrapped fish in plastic at this position. (Id.). Plaintiff testified that he worked at this position for about six months, at which time he was laid off. (Tr. 51). Plaintiff stated that he did not have any difficulty getting along with people when he worked at this position. (Id.).

Plaintiff testified that he worked for Action Temps and Atlas Reserve Temps in 2001. (Id.). Plaintiff stated that he worked at Anheuser-Busch cleaning kitchens at this position. (Id.). Plaintiff testified that he also worked at a position recycling bottles. (Id.).

Plaintiff stated that he worked for JJ Enterprises in 1999. (Tr. 52). Plaintiff testified that, at this position, he worked for Joyce Johnson, who owned a real estate company. (Id.). Plaintiff stated that he performed odd jobs at this position, including roofing, painting, installing doors, and performing other maintenance work on properties. (Tr. 52-53). Plaintiff testified that he lived in one of Ms. Johnson's apartments at one time and performed jobs to help with his rent. (Id.).

Plaintiff stated that he was still working for Ms. Johnson at the time of the hearing. (Id.). Plaintiff testified that he installed a door days prior to the hearing. (Id.). Plaintiff stated that his father taught him the carpentry skills required to install a door. (Id.). Plaintiff testified that Ms. Johnson paid him $40 to install the door. (Tr. 54). Plaintiff stated that he often performs odd jobs for Ms. Johnson. (Id.). Plaintiff testified that Ms. Johnson did not own the apartment in which he lived at the time of the hearing. (Id.).

Plaintiff stated that he had difficulty sleeping due to his medication and that he wakes up during the night. (Tr. 55). Plaintiff testified that he usually wakes up at about 3:00 a.m., goes back to sleep, and wakes for the day at 5:00 to 6:00 a.m. (Id.). Plaintiff stated that, when he wakes up, he usually just sits in bed and prays. (Tr. 56). Plaintiff testified that he cooks breakfast and then runs a few blocks. (Id.). Plaintiff stated that he has been running for about two years but he has not entered any races. (Id.). Plaintiff testified that running helps his arthritis. (Tr. 57). Plaintiff stated that he watches a lot of television during the day. (Id.). Plaintiff testified that he occasionally takes the metro to visit friends in shelters. (Id.). Plaintiff stated that he does not have many friends but he has "associates," whom he does not trust. (Tr. 58). Plaintiff testified that he was a loner growing up and did not have many friends. (Id.). Plaintiff stated that he gets along with his family. (Id.). Plaintiff testified that he gets along well with one of his neighbors. (Tr. 59). Plaintiff stated that he tries to attend church every week. (Id.).

Plaintiff testified that he lives alone. (Id.). Plaintiff stated that he cooks his own meals. (Id.). Plaintiff testified that his mother taught him how to cook. (Tr. 60). Plaintiff stated that he does laundry, washes dishes, makes his bed, sweeps, and mops. (Id.). Plaintiff testified that he shops for groceries. (Id.). Plaintiff stated that his mother helps him shop by reading labels to him. (Id.).

Plaintiff testified that he enjoys going to the movies and going roller skating in the evenings. (Tr. 61). Plaintiff stated that he also boxes at the gym. (Id.).

Plaintiff testified that he smokes about one package of cigarettes a day. (Tr. 62). Plaintiff stated that he quit for eight years and recently started again. (Id.). Plaintiff testified that he drinks occasionally. (Id.). Plaintiff stated that he has never been convicted of a DUI or a DWI. (Id.).

Plaintiff testified that he has been off drugs for about eight years. (Tr. 63). Plaintiff stated that he used crack cocaine and many other drugs in the past. (Id.).

Plaintiff testified that he was taking Atenolol for high blood pressure. (Tr. 64). Plaintiff stated that he was diagnosed with high blood pressure while in prison and that the Atenolol was controlling his blood pressure. (Id.). Plaintiff testified that he takes calcium carbonate because he had blood in his stool. (Tr. 65). Plaintiff testified that he takes Mirtazapine,[1] Haldol,[2] and Cogentin[3] for his mental problems. (Tr. 65-66). Plaintiff stated that these medications help him to relax and stay "not too high." (Tr. 66). Plaintiff stated that he takes Naproxen[4] for his arthritis. (Tr. 67). Plaintiff testified that he occasionally takes over-the-counter aspirin for migraine headaches. (Id.).

Plaintiff stated that he has severe arthritis in his knees, hands, and low back. (Tr. 68). Plaintiff testified that the Naproxen helps his arthritis pain. (Id.). Plaintiff rated his arthritis pain as a ten on a scale of one to ten when he does not take the Naproxen. (Id.). Plaintiff stated that it is sometimes difficult to use his hands due to the arthritis. (Tr. 69). Plaintiff testified that he occasionally has difficulty buttoning shirts. (Id.). Plaintiff testified that the Naproxen reduces his

---

[1] Mirtazapine is indicated for the treatment of major depressive disorder. See Physicians' Desk Reference (PDR), 2924 (63rd Ed. 2009).

[2] Haldol is an antipsychotic medication indicated for the treatment of schizophrenia. See WebMD, http://www.webmd.com/drugs (last visited February 25, 2011).

[3] Cogentin is indicated for the treatment of Parkinson's disease or involuntary movements due to the side effects of certain psychiatric drugs such as Haldol. See WebMD, http://www.webmd.com/drugs (last visited February 25, 2011).

[4] Naproxen is a nonsteroidal anti-inflammatory drug indicated for the treatment of osteoarthritis. See PDR at 2633.

pain.  (Tr. 69-70).  Plaintiff stated that he believes he is in fairly good shape physically for his age.  (Tr. 70).  Plaintiff testified that he suffers from a rash that is hereditary.  (Id.).

Plaintiff testified that he went to the hospital the year prior to the hearing for pain in his right heel.  (Id.).  Plaintiff stated that he still has right heel pain and that he does not know the cause of this pain.  (Id.).

Plaintiff testified that he experiences side effects, such as his tongue swelling, when the dosage of his medications is changed.  (Tr. 71).

Plaintiff stated that he was under psychiatric care at the time of the hearing.  (Id.).  Plaintiff testified that he did not know the name of his psychiatrist.  (Id.).  Plaintiff stated that his psychiatrist is treating him for problems with his mood.  (Tr. 72).  Plaintiff testified that his moods change often.  (Id.).  Plaintiff stated that he has been diagnosed with bipolar disorder.[5]  (Id.).  Plaintiff testified that when he experiences a manic episode, he feels "high," or really good.  (Tr. 73).  Plaintiff stated that when he is not manic, he becomes depressed and cries often.  (Tr. 73).  Plaintiff testified that he occasionally has anxiety attacks.  (Id.).

Plaintiff stated that he was placed in a strip cell when he was in prison because prison officials thought he was going crazy.  (Tr. 74).  Plaintiff testified that he experiences hallucinations.  (Tr. 74).  Plaintiff stated that he sees aliens and monsters.  (Id.).  Plaintiff testified that he also hears voices.  (Id.).  Plaintiff stated that the voices have told him to kill people or harm people.  (Tr. 75).

Plaintiff testified that his concentration ability varies.  (Id.).

_____

[5]An affective disorder characterized by the occurrence of alternating periods of euphoria (mania) and depression.  Stedman's Medical Dictionary, 568 (28th Ed. 2006).

Plaintiff stated that he does not have difficulty sitting, standing, or walking. (Id.). Plaintiff testified that he is able to lift about fifty pounds. (Id.). Plaintiff stated that he lifted the door that he recently installed, which was a hollow aluminum door. (Id.). Plaintiff testified that he does not have problems bending, stooping, crouching, kneeling, or crawling, except that he has difficulty moving his arm when he has sores from a rash. (Id.). Plaintiff stated that the rash comes and goes. (Id.).

Plaintiff's attorney then examined plaintiff, who testified that he received his certification for working in hotels when he was homeless. (Tr. 77). Plaintiff stated that the school paid him to attend classes and he needed the money. (Id.).

Plaintiff testified that he recently took his driver's license test. (Id.). Plaintiff stated that the employees at the license bureau read the test to him. (Id.). Plaintiff testified that he is able to read small words but not big words. (Tr. 78). Plaintiff stated that he was able to read some words on the driver's license test but he has difficulty reading sentences. (Id.). Plaintiff testified that he did not complete his medications list. (Id.). Plaintiff stated that Mr. Goens completed the medications list because plaintiff was unable to write down his medications. (Id.).

Plaintiff testified that he has known Ms. Johnson for twenty-five years. (Tr. 79). Plaintiff stated that Ms. Johnson gives him odd jobs because she has known him for so long. (Id.). Plaintiff testified that he did not know whether he would be able to work every day, all day long performing odd jobs. (Id.). Plaintiff stated that he did not know if Ms. Johnson liked his work. (Id.). Plaintiff testified that he works on Ms. Johnson's personal residence and her properties. (Id.). Plaintiff stated that Ms. Johnson occasionally works with him because he does not perform the task properly. (Id.). Plaintiff testified that Ms. Johnson frequently supervises him and helps

him with projects.  (Id.).  Plaintiff stated that Ms. Johnson helped him install the door and gave him directions.  (Id.).

Plaintiff testified that he feels less depressed after taking his medications.  (Tr. 80).  Plaintiff stated that he always takes his medications and that no one reminds him to take it.  (Id.).

Plaintiff testified that he was on parole and that he has to take random drug tests.  (Id.).  Plaintiff stated that he has tested positive for alcohol because he drank beer.  (Id.).  Plaintiff testified that he has not tested positive for any other drugs.  (Tr. 81).

Plaintiff stated that Natalie Ray helped him get his apartment and get on his feet.  (Id.).  Plaintiff testified that he moved into his apartment three to four weeks prior to the hearing.  (Id.).  Plaintiff stated that Ms. Ray comes to the apartment to check on him once a week.  (Id.).  Plaintiff testified that Ms. Ray brings him bus tickets.  (Id.).

Plaintiff stated that Mr. Goens helps him look for jobs and fill out paperwork.  (Tr. 82).  Plaintiff testified that Mr. Goens also reads for him and drives him places.  (Id.).  Plaintiff stated that Mr. Goens drove him to the hearing.  (Id.).  Plaintiff testified that Mr. Goens also drives him to other places, such as the food stamp office.  (Id.).  Plaintiff stated that he takes the bus to Mr. Goens's office.  (Id.).  Plaintiff testified that he does not read the bus schedule.  (Id.).  Plaintiff stated that he just gets on a bus and asks the driver where the bus is going.  (Id.).

Plaintiff testified that he is unable to work primarily because of the voices he hears and his mood changes.  (Tr. 83).  Plaintiff stated that he occasionally wants to hurt people.  (Id.).  Plaintiff testified that he does not have friends.  (Id.).  Plaintiff stated that he trusts Mr. Goens and that he has known Mr. Goens for about one year.  (Id.).

Plaintiff's attorney next examined Natalie Ray, who testified that she knew plaintiff

through the Horizon Club, which is a twenty-four-hour safe haven for homeless individuals. (Tr. 84). Ms. Ray stated that she was a social worker at Horizon Club. (Id.). Ms. Ray testified that plaintiff started coming to Horizon Club and was screened by Keith Donaldson to determine if he had a developmental disability. (Id.). Ms. Ray stated that Mr. Donaldson believed plaintiff had a developmental disability based on testing performed and referred plaintiff to Ms. Ray. (Id.). Ms. Ray explained that persons with developmental disabilities are eligible for a transitional housing program. (Id.). Ms. Ray testified that she found housing for plaintiff through the transitional housing program and plaintiff moved into his apartment in February of 2009. (Tr. 85).

Ms. Ray stated that persons receiving housing under the transitional housing program are required to pay thirty percent of their income to rent. (Id.). Ms. Ray testified that, because plaintiff has no income, he is not required to pay rent. (Id.). Ms. Ray stated that, if plaintiff begins working, he will be required to pay thirty percent of his income for rent. (Id.). Ms. Ray testified that Horizons places these funds into a savings account to help pay for expenses when the individual moves into a permanent residence. (Id.). Ms. Ray stated that the transitional housing program is a twelve-month program. (Id.).

Ms. Ray testified that the purpose of the program is to help people obtain some type of permanent housing based on the individual's needs. (Tr. 86). Ms. Ray stated that the program also addresses other issues that keep individuals on the street. (Id.). Ms. Ray testified that plaintiff has substance abuse issues, mental health issues, and developmental disabilities, which make it difficult for him to live on his own. (Id.). Ms. Ray stated that, as plaintiff's case worker, she meets with plaintiff once a week in his apartment. (Id.). Ms. Ray testified that plaintiff also stops by Horizon Club approximately twice a week. (Id.). Ms. Ray stated that she visits plaintiff

at his apartment to make sure plaintiff is able to take care of the apartment. (Tr. 87). Ms. Ray noted that Horizon Club is listed as the lessee on plaintiff's apartment lease. (Id.). Ms. Ray testified that she also visits plaintiff to work on issues that have been identified in his housing plan, which include finding income; taking his medications; working with his Hopewell case worker, Mr. Goens; working with his probation officer; and staying clean. (Id.).

Plaintiff's attorney next examined Mr. Goens, who testified that he had been employed as a Community Support Worker at Hopewell Center for one year and three months. (Tr. 88). Mr. Goens stated that he creates treatment plans for clients, which involves assessing the client's mental, physical, emotional, and financial needs. (Id.). Mr. Goens testified that he had been working with plaintiff since October of 2007. (Id.). Mr. Goens stated that plaintiff registered at Hopewell Center, was referred to a community support rehabilitation program, and was assigned to Mr. Goens's caseload. (Id.).

Mr. Goens testified that he was aware that plaintiff was on probation and that he has received a small amount of correspondence from the probation office. (Tr. 89). Mr. Goens stated that plaintiff began the drug program at Hopewell in October of 2007 and recently graduated from the program. (Id.). Mr. Goens testified that plaintiff never tested positive for drugs while he was in the program. (Id.). Mr. Goens stated that, to his knowledge, plaintiff had not tested positive in drug tests administered by the probation office. (Id.). Mr. Goens testified that the only substance plaintiff has used is alcohol. (Id.).

Mr. Goens stated that he sees plaintiff at least once a week and sometimes twice a week. (Tr. 90). Mr. Goens testified that he is required by the Department of Mental Health to monitor plaintiff's case closely. (Id.). Mr. Goens stated that he makes sure that plaintiff is taking his

medication as prescribed and inquires about any needs plaintiff may have, such as obtaining food or clothing. (Id.). Mr. Goens testified that he also helps plaintiff read his mail, including correspondence from the SSA. (Id.). Mr. Goens stated that he completed plaintiff's medications list for the hearing because plaintiff was unable to complete it. (Id.). Mr. Goens testified that plaintiff has problems reading and writing. (Tr. 91).

Mr. Goens stated that he is familiar with the signs and symptoms of mental illness and he has noticed such signs and symptoms in plaintiff. (Id.). Mr. Goens testified that plaintiff exhibits the symptoms of bipolar disorder and that his mood is primarily manic. (Id.). Mr. Goens stated that, when plaintiff is not compliant with his medication, he is very hyper, has flight of ideas, and his thoughts begin to race. (Id.). Mr. Goens stated that plaintiff's ability to focus is impaired. (Id.). Mr. Goens testified that plaintiff's depression is due to financial circumstances, including his inability to work and lack of food. (Id.). Mr. Goens stated that plaintiff has mentioned suicide to him in the past but he has never tried to carry it out. (Id.).

Mr. Goens testified that he has helped plaintiff look for a job. (Tr. 92). Mr. Goens stated that he has helped plaintiff conduct searches online and set-up an email address. (Id.). Mr. Goens testified that plaintiff is only able to read short, simple words. (Id.). Mr. Goens stated that he believes employers would only tolerate plaintiff's symptoms to a certain degree. (Id.). Mr. Goens testified that, when plaintiff visits Mr. Goens at the center, plaintiff annoys the staff and security guards by talking and being "always in your face." (Id.). Mr. Goens stated that plaintiff behaves in this manner even when he takes his medication. (Tr. 93).

Mr. Goens testified that, as long as plaintiff is working with Mr. Goens and Ms. Ray, he can have stability, although he advocates plaintiff receiving disability benefits. (Id.). Mr. Goens

stated that plaintiff may be able to perform part-time work in the future but he did not believe that plaintiff was capable of working at the time of the hearing. (Id.). Mr. Goens testified that plaintiff needs to be seen by a case worker one to two times a week. (Id.). Mr. Goens stated that he tries to empower plaintiff and encourages him to do something productive such as volunteer. (Id.). Mr. Goens testified that he also tries to increase plaintiff's social skills so that he can be properly integrated into the community. (Tr. 94).

The ALJ then examined Mr. Goens, who testified that he is trying to help plaintiff find a job and that he has helped plaintiff fill out four to five job applications. (Id.). Mr. Goens stated that plaintiff has applied for janitorial positions at hotels and factory jobs. (Id.). Mr. Goens testified that plaintiff has complained about arthritis in his knees and has indicated that he did not know how long he would be able to work physically. (Id.). Mr. Goens stated that when he is with plaintiff, plaintiff is unable to stand up or sit down for long periods. (Id.). Mr. Goens testified that he was unaware that plaintiff jogged a couple of blocks every day. (Tr. 95).

The ALJ next asked plaintiff, at the request of the vocational expert, whether he had ever boxed. (Tr. 97). Plaintiff testified that he had never boxed. (Id.). Plaintiff stated that he just goes to the gym to box. (Tr. 98). Plaintiff testified that he last boxed fifteen years prior to the hearing. (Id.).

The ALJ then examined the vocational expert, Dr. Magrowski, who testified that he was unsure whether plaintiff's past work would be qualified as substantial gainful activity. (Tr. 99). The ALJ stated that he was considering plaintiff as not having any past relevant work. (Id.).

The ALJ next asked Dr. Magrowski to assume a hypothetical claimant with no physical limitations who was limited to simple repetitive tasks and instructions. (Id.). Dr. Magrowski

testified that because plaintiff has no past relevant work and the individual is limited to simple work, he has no transferable work skills. (Id.). Dr. Magrowski testified that the individual could perform work, including cleaning work, which was medium and unskilled (over a million such positions nationally, 20,000 in the State); work packing, which was light to medium and unskilled (350,000 nationally, 4,000 in the State); and laundry work, which was medium and unskilled (150,000 nationally, 4,000 in the State). (Tr. 99-100).

Plaintiff's attorney then examined Dr. Magrowski. (Tr. 100). Plaintiff's attorney asked Dr. Magrowski to assume a claimant with plaintiff's background who would miss approximately four days of work each month due to impairments or treatment. (Id.). Dr. Magrowski testified that the individual may be able to find a job and perform it for a little while, but probably not long enough to complete a trial work period as he would be terminated. (Id.). Dr. Magrowski stated that the jobs that he previously identified require a worker to show up every day. (Id.).

Plaintiff's attorney next asked Dr. Magrowski to assume a hypothetical claimant with the same background as plaintiff who was unable to complete a normal workday and workweek without interruptions from psychologically-based symptoms. (Id.). Dr. Magrowski testified that he did not know of any jobs that such an individual could perform. (Tr. 101).

Plaintiff's attorney then asked Dr. Magrowski whether an individual with a GAF score of 50 would be capable of performing any jobs. (Id.). Dr. Magrowski testified that he did not know of any jobs that such an individual could maintain. (Id.).

The ALJ noted that plaintiff had been given a GAF score of 60 even though it was noted that he had a psychotic disorder, he suffered from cocaine dependence, and he had been in jail for drug trafficking. (Id.). He stated that the evidence regarding plaintiff's mental status was

- 14 -

"somewhat murky." (Id.). The ALJ indicated that he would order a full mental status examination with IQ testing. (Id.).

**B.** **Supplemental ALJ Hearing**

A supplemental hearing was held on July 9, 2009, at the request of plaintiff's attorney. (Tr. 26). Mr. Goens provided additional testimony at the supplemental hearing. (Tr. 27).

Plaintiff's attorney examined Mr. Goens, who testified that he had worked at Hopewell Center for two years and that plaintiff had been his client for two years. (Id.). Mr. Goens stated that he believed he had additional information since the last hearing, which would shed some light on plaintiff's functioning. (Tr. 28). Mr. Goens testified that he had a college degree in the field of sociology and psychology. (Id.). Mr. Goens stated that he had also gained experience with mental illness through his on-the-job training. (Id.). Mr. Goens explained that he visits with clients in their homes, and accompanies clients to doctor appointments and shelters. (Id.).

Mr. Goens testified that he develops a treatment plan for his clients based on the client's goals. (Id.). Mr. Goens stated that plaintiff's primary goal is to maintain stability in the areas of housing and finances. (Tr. 29). Mr. Goens testified that plaintiff's housing goal has been accomplished, as plaintiff was homeless when he started the program and he now lives in an apartment. (Id.).

Mr. Goens stated that it has been difficult to meet plaintiff's goal of financial stability due to factors that are fighting against plaintiff. (Id.). Mr. Goens explained that plaintiff is a convicted felon, lives beneath the poverty line, is an African-American male, and does not have a general education. (Id.). Mr. Goens testified that, despite these factors, plaintiff has worked and has been compliant with psychiatric treatment. (Id.). Mr. Goens stated that plaintiff has attended

and has graduated from the drug program. (Id.). Mr. Goens testified that plaintiff participated in the drug program despite being sober for seven years, to demonstrate that he wanted to do better. (Id.). Mr. Goens stated that plaintiff was pursuing his GED and was taking GED preparation classes at the time of the hearing. (Id.).

Mr. Goens testified that he did not believe that plaintiff could function at the level he was functioning at the time of the hearing without the support of Mr. Goens and his other case worker, Natalie. (Tr. 30). Mr. Goens stated that plaintiff does not have a support system other than his mother to push him in a positive direction. (Id.). Mr. Goens testified that he reads plaintiff's mail, including correspondence from the SSA; and helps him complete forms. (Id.). Mr. Goens stated that plaintiff has made progress since the time Mr. Goens began working with him. (Id.). Mr. Goens testified that the support of Mr. Goens and Natalie has helped plaintiff to be stable. (Id.).

Mr. Goens stated that he sees plaintiff twice a week for varying amounts of time depending on plaintiff's needs. (Tr. 31). Mr. Goens testified that a few days prior to the hearing, he was at plaintiff's house for two hours, helping him read correspondence from Vocational Rehab. (Id.). Mr. Goens stated that he occasionally goes shopping with plaintiff to show him how to budget his money. (Id.). Mr. Goens testified that he recently helped plaintiff with math problems from his GED course. (Id.). Mr. Goens stated that an average visit with plaintiff lasts one-and-a-half to two hours. (Id.).

Mr. Goens testified that plaintiff is able to make change. (Id.). Mr. Goens stated that plaintiff has common sense and is able to count. (Tr. 32). Mr. Goens testified that he believed that plaintiff would be able to budget his money if he received monthly disability benefits because

Mr. Goens has helped plaintiff to budget money and read. (Id.).

Mr. Goens stated that he thought that the award of benefits would have a positive impact on plaintiff. (Id.). Mr. Goens testified that he and Natalie meet with plaintiff weekly to check on him and that they care for plaintiff. (Tr. 33).

Plaintiff's attorney cited findings from a SSA doctor's report that plaintiff suffers from cocaine abuse and polysubstance dependence and that plaintiff is still using drugs and alcohol. (Id.). Mr. Goens testified that he did not believe that plaintiff was still using drugs and alcohol. (Id.). Mr. Goens stated that plaintiff never tested positive for drugs when he was participating in the drug program and he never received a report from plaintiff's parole office that plaintiff was using drugs. (Id.).

Mr. Goens testified that plaintiff has progressed despite the negative factors in his life that would hinder him from being a productive citizen of society. (Id.). Mr. Goens stated that plaintiff has a learning disability in addition to a mental illness. (Tr. 34). Mr. Goens testified that plaintiff requires assistance and financial help. (Id.). Mr. Goens stated that, although he is not a doctor, he is trained to serve people who suffer from mental illness and has experience with plaintiff. (Tr. 34-35).

## C. **Relevant Medical Records**

Plaintiff was incarcerated from January 25, 2005, through August 7, 2007, during which time he received medical treatment through the Missouri Department of Corrections. (Tr. 352, 441). On January 25, 2005, plaintiff was seen for an initial mental health screening. (Tr. 445). Plaintiff reported that he had been hospitalized for psychiatric reasons three times and that he had jumped off a bridge in a suicide attempt in the 1980s. (Id.). Plaintiff indicated that he had used crack cocaine

daily for about twenty years and that he had last used the substance eighteen months prior. (Id.).

Plaintiff reported that he hears voices that try to control him, and that he had taken Haldol for this

problem. (Tr. 446). Plaintiff was diagnosed with schizophrenia,[6] paranoid type;[7] and history of

cocaine dependancy; and was assessed a GAF[8] score of 49.[9] (Id.).

On January 31, 2005, plaintiff was assessed a GAF score of 60.[10] (Tr. 448). Plaintiff was

prescribed Prozac[11] and Trazodone.[12] (Id.).

On February 2, 2005, plaintiff complained of anxiety attacks. (Tr. 449). Plaintiff was

diagnosed with drug induced mood disorder with sleep and depressive symptoms, and personality

---

[6]A common type of psychosis characterized by abnormalities in perception, content of thought, and thought processes (hallucinations and delusions) and by extensive withdrawal of interest from other people and the outside world, with excessive focusing on one's own mental life. Stedman's at 1729.

[7]Schizophrenia characterized predominantly by delusions of persecution and megalomania. Stedman's at 1729.

[8]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[9]A GAF score of 41-50 indicates "serious symptoms" or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV at 32.

[10]A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 32.

[11]Prozac is a psychotropic drug indicated for the treatment of major depressive disorder. See PDR at 1854.

[12]Trazodone is an antidepressant medication indicated for the treatment of depression and mood disorders. See WebMD, http://www.webmd.com/drugs (last visited February 25, 2011).

- 18 -

disorder,[13] and was assessed a GAF score of 60.  (Id.).

On March 14, 2005, plaintiff was diagnosed with drug induced mood and sleep disorder; schizophrenia, residual type; and personality disorder; and was assessed a GAF score of 70.[14]  (Tr. 452).

On April 12, 2005, it was noted that plaintiff appeared to be of limited IQ and that he had a limited ability to read and write.  (Tr. 453).  Plaintiff's mood and affect were described as flat and constrained, and his responses were described as literal.  (Id.).  Plaintiff was not suicidal or homicidal and denied any psychotic symptoms.  (Id.).  Plaintiff was diagnosed with drug induced mood disorder by history, and depressive disorder by exam.  (Id.).  Plaintiff was continued on Trazodone.  (Tr. 454).

On May 12, 2005, plaintiff was doing well and had a good attitude.  (Tr. 454).  Plaintiff was diagnosed with drug induced mood disorder and stable depressive disorder.  (Id.).  On June 13, 2005, plaintiff was assessed a GAF score of 64.  (Id.).  On June 22, 2005, it was noted that plaintiff exhibited very concrete thinking, poor judgment, and poor insight.  (Tr. 455).

On July 21, 2005, plaintiff's mood and affect were described as worried and anxious; plaintiff was not suicidal or homicidal, but plaintiff was angry.  (Id.).  Plaintiff was diagnosed with drug induced mood disorder with psychoses and was given a GAF score of 55.  (Id.).  Plaintiff's dosage

---

[13]General term for a group of behavioral disorders characterized by usually lifelong ingrained maladaptive patterns of subjective internal experience and deviant behavior, lifestyle, and social adjustment, which patterns may manifest in impaired judgment, affect, impulse control and interpersonal functioning.  Stedman's at 570.

[14]A GAF score of 61-70 denotes some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.  DSM-IV at 32.

of Trazodone was increased.  (Id.).

On August 24, 2005, plaintiff reported that he was not having any problems with medication or symptoms.  (Tr. 457).  Plaintiff was described as stable, and was diagnosed with mood disorder, with a GAF score of 55.  (Id.).  Plaintiff was assessed a GAF score of 60 on August 26, 2005.  (Tr. 458).

On September 6, 2005, plaintiff reported that he was doing well, was not depressed, and he did not hear voices.  (Tr. 458).  Plaintiff's speech was slow and his intellect was described as very limited.  (Tr. 459).  Plaintiff reported that he had received disability benefits for mental retardation. (Id.).  Plaintiff was diagnosed with mood disorder,[15] polysubstance dependence, and mild mental retardation,[16] and was assessed a GAF score of 60.  (Id.).

On November 24, 2005, plaintiff reported that he was doing well.  (Tr. 460).  Plaintiff's affect was broad and there was no evidence of psychosis.  (Id.).  Plaintiff was diagnosed with mood disorder and polysubstance dependence, and was assessed a GAF score of 70.  (Id.).

On January 26, 2006, plaintiff asked for a note for his teacher explaining that he hears voices

_____

[15]A group of mental disorders involving a disturbance of mood, accompanied by either a full or partial manic or depressive syndrome that is not due to any other mental disorder. Stedman's at 569.

[16]Mild Mental Retardation is characterized by an IQ score of 50 -55 to approximately 70. See DSM-IV at 40.  "Mild Mental Retardation is roughly equivalent to what used to be referred to as the educational category of 'educable.'  This group constitutes the largest segment (about 85%) of those with the disorder.  As a group, people with this level of Mental Retardation typically develop social and communication skills during the preschool years (ages 0-5 years), have minimal impairment in sensorimotor areas, and often are not distinguishable from children without Mental Retardation until a later age.  By their late teens, they can acquire academic skills up to approximately the skills adequate for minimum self-support, but may need supervision, guidance, and assistance, especially when under unusual social or economic stress.  With appropriate support, individuals with Mild Mental Retardation can usually live successfully in the community, either independently or in supervised settings."  Id. at 41.

and talks back to them. (Tr. 461-62). Plaintiff stated that this resulted in him getting sent to the hole. (Tr. 462). Plaintiff indicated that the voices were not telling him to kill himself. (Id.). It was noted that plaintiff had limited intellect and did not appear to be responding to any internal stimuli. (Id.). Plaintiff was diagnosed with mood disorder and polysubstance disorder, and was assessed a GAF score of 60. (Id.).

On February 25, 2006, plaintiff reported that his moods were more stable with his medication. (Tr. 462). Plaintiff was diagnosed with mood disorder and was assessed a GAF score of 60. (Id.). Plaintiff reported that his medication was making him sleepy and that he was having difficulty waking up for count in April 2006. (Tr. 466).

On May 12, 2006, plaintiff appeared to attempt to control the contact by manipulation and veiled intimidation. (Tr. 468). Plaintiff's speech and motor activity appeared normal yet plaintiff verbalized multiple thinking errors regarding his role of responsibility in life choices. (Tr. 468-69). Plaintiff exhibited narcissism, and skewed perception and judgment. (Tr. 469). Anti-social values were verbalized, and his reasoning was non-linear. (Id.). Plaintiff was diagnosed with a mood disorder. (Id.).

On June 13, 2006, plaintiff attempted to control the conversation, and appeared to be pursuing an agenda. (Tr. 470). Plaintiff exhibited poor insight and judgment and skewed social perception. (Id.). Plaintiff refused to "accept responsibility for his actions and for his role in becoming more socially and emotionally healthy." (Id.). Plaintiff became frustrated when his attempts to control the conversation were ineffective. (Id.). Plaintiff was diagnosed with mood disorder and polysubstance dependence. (Id.).

Plaintiff was described as stable and cooperative on August 9, 2006, and August 31, 2006.

- 21 -

(Tr. 471).

On October 4, 2006, plaintiff avoided eye contact but was outgoing and friendly. (Tr. 472). Plaintiff was diagnosed with bipolar disorder, last manic, in remission; and  was assessed a GAF score of 70. (Id.).

On November 9, 2006, plaintiff presented in a stable mood with a flat affect and poor eye contact. (Tr. 473). Plaintiff's insight and judgment appeared adequate. (Id.). Plaintiff was diagnosed with mood disorder and polysubstance disorder. (Id.).

On December 8, 2006, plaintiff presented in a stable mood, with a bright affect and good eye contact. (Id.). He was diagnosed with bipolar disorder, last manic, in remission; and cocaine dependance. (Id.).

On December 28, 2006, plaintiff reported that his mood was great. (Tr. 474). He was diagnosed with mood disorder, polysubstance dependance, and mild mental retardation, and was assessed a GAF score of 60. (Id.).

On March 12, 2007, plaintiff presented in a stable mood with a bright affect, and intact insight and judgment. (Tr. 475). Plaintiff was diagnosed with bipolar disorder, last manic, in remission; and cocaine dependence. (Id.).

On March 26, 2007, plaintiff exhibited garbled speech and limited intellect based on grammar and vocabulary. (Id.). Plaintiff panicked when he was told that Trazodone and all sedating tricyclics were being stopped. (Id.). Plaintiff was started on Paxil.[17] (Id.).

On April 24, 2007, plaintiff complained of dizziness with the Paxil. (Tr. 476). Plaintiff's

_____

[17]Paxil is a psychotropic drug indicated for the treatment of major depressive disorder. See PDR at 1536.

affect was depressed.  (Id.).  He was diagnosed with mood disorder and polysubstance dependance, and mild mental retardation; and was assessed a GAF score of 60.  (Id.).  Paxil was discontinued and plaintiff was started on Mirtazapine.  (Id.).

On May 22, 2007, plaintiff reported that he was doing well and that he planned to return to St. Louis when he was released in a month.  (Id.).  Plaintiff's affect was broad and very animated.  (Tr. 477).  Plaintiff was almost hypomanic[18] in appearance and had no insight into his criminal thoughts or his drug problem.  (Id.).  Plaintiff was diagnosed with mood disorder, polysubstance dependence, and mild mental retardation, and was assessed a GAF score of 70.  (Id.).

On June 26, 2007, plaintiff presented in a stable mood with a flat/dull affect, poor eye contact, and adequate insight and judgment.  (Id.).

On July 17, 2007, plaintiff presented in a stable mood, with a dramatic affect, and adequate insight and judgment.  (Tr. 478).  Plaintiff was diagnosed with mood disorder and polysubstance disorder, and was assessed a GAF score of 70.  (Id.).

On July 31, 2007, plaintiff presented for discharge planning.  (Tr. 478).  Plaintiff's mood was stable, his affect was bright, and his insight and judgment appeared adequate.  (Id.).  Plaintiff was diagnosed with mood disorder, polysubstance dependence, and was assessed a GAF score of 70.  (Id.).

On September 12, 2007, plaintiff saw a psychiatrist at the Missouri Department of Mental Health.  (Tr. 228-31).  Plaintiff appeared worried, was overly dramatic, uncooperative, had a depressed mood, below normal intellect, poor judgment, and poor insight.  (Id.).  Plaintiff was

---

[18]A mild degree of mania.  Stedman's at 934.

diagnosed with antisocial personality disorder[19] and cocaine dependence, and was assessed a GAF score of 60. (Tr. 231). Plaintiff was prescribed Haldol. (Id.).

Kyle DeVore, Ph.D. completed a Psychiatric Review Technique on September 19, 2007. (Tr. 498-509). Dr. DeVore expressed the opinion that plaintiff suffered from a mood disorder and polysubstance dependence, which did not satisfy diagnostic criteria. (Id.). Dr. DeVore found that plaintiff's impairments caused mild limitations in plaintiff's ability to maintain social functioning and ability to maintain concentration, persistence, or pace. (Tr. 506).

Plaintiff presented to Florence Hill Health Center on September 25, 2007, for management of his hypertension. (Tr. 281). Plaintiff complained of joint pain in his knees. (Id.). John E. Hartweger, M.D. diagnosed plaintiff with benign essential hypertension[20] and schizophrenia. (Tr. 282). Dr. Hartweger prescribed Triamterene,[21] Haldol, and Naproxen. (Tr. 283).

Plaintiff presented to Alicia Gonzalez, M.D. on October 18, 2007, for an annual psychiatric evaluation. (Tr. 300-01). Dr. Gonzalez indicated that plaintiff had been referred by his parole officer for continuity of care. (Tr. 300). Plaintiff reported extreme mood swings, auditory hallucinations, pacing the floor at night, and inability to sleep at night. (Id.). Plaintiff also reported having lots of energy, migraine headaches, and occasional breathing problems accompanying his auditory hallucinations. (Id.). Plaintiff's speech was coherent and relevant, his memory was not impaired, his sensorium was clear, and his cognitive function seemed to be below average. (Id.). Dr. Gonzalez

---

[19]An enduring and pervasive pattern characterized by continuous, and chronic antisocial behavior with disregard for and violation of the rights and safety of others, beginning before the age of 15. Stedman's at 567.

[20]High blood pressure without known cause that runs a relatively long and symptomless course. See Stedman's at 927.

[21]Triamterene is indicated for the treatment of hypertension or edema. See PDR at 1405.

diagnosed plaintiff with polysubstance dependence, in remission; and bipolar disorder, most recent episode hypomanic; and assessed a current GAF score of 40.[22]  (Tr. 301).  Dr. Gonzalez prescribed Risperdal,[23] Cogentin, and Trazodone.  (Id.).

On November 10, 2007, Pamela Buchanan, M.D., a physician at Florence Hill Health Center, completed a Mental Residual Functional Capacity Questionnaire.  (Tr. 311-15).  Dr. Buchanan expressed the opinion that plaintiff's abilities were seriously limited but not precluded in the following areas: remember work-like procedures; carry-out very short and simple instructions;  sustain an ordinary routine without special supervision; set realistic goals or make plans independently of others; and maintain socially appropriate behavior.  (Tr. 313).  Dr. Buchanan expressed the opinion that plaintiff was unable to meet competitive standards in the following areas: work in coordination with or proximity to others without being unduly distracted; complete a normal work day and work week without interruptions from psychologically based symptoms; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to changes in a routine work setting; deal with normal work stress; and deal with stress of semiskilled and skilled work.  (Id.).  Dr. Buchanan indicated that her opinion regarding plaintiff's limitations was based on plaintiff's chart history.  (Id.).  Dr. Buchanan indicated that plaintiff does not have a low IQ or reduced intellectual functioning.  (Tr. 314).  Dr. Buchanan stated that patients with schizophrenia have social difficulties and side effects from medication causing psychomotor retardation.  (Id.).  Dr.

---

[22]A GAF score of 31-40 denotes some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work).  DSM-IV at 32.

[23]Risperdal is a psychotropic drug indicated for the treatment of schizophrenia.  See PDR at 1754.

Buchanan indicated that plaintiff's impairment had lasted or could be expected to last at least twelve months.  (Tr. 315).  Dr. Buchanan expressed the opinion that plaintiff was not a malingerer.  (Id.).

On November 13, 2007, plaintiff complained of blood in his urine.  (Tr. 278).  Dr. Hartweger's assessment was hematuria[24] and knee pain.  (Tr. 279).  On November 26, 2007, plaintiff complained of blood in his stool.  (Tr. 276).  Dr. Hartweger's assessment was hematochezia,[25] hematuria, hypertension, and schizophrenia.  (Tr. 277).  On December 18, 2007, plaintiff continued to complain of blood in his stool.  (Tr. 273).  Dr. Hartweger's assessment was essential hypertension, schizophrenia, blood in stool, and joint pain.  (Tr. 274).  On April 8, 2008, Dr. Hartweger's assessment was essential hypertension, hyperlipidemia,[26] hematochezia, and elevated glucose.  (Tr. 268-69).

A Medication Profile from Hopewell Center dated December 17, 2008, indicates that Dr. Gonzalez had prescribed Haldol and Cogentin and that plaintiff had a poor history of compliance with medication.  (Tr. 540).

Dr. Gonzalez completed a Mental Residual Functional Capacity Questionnaire on December 30, 2008.  (Tr. 509-13).  Dr. Gonzalez listed plaintiff's diagnosis as bipolar I disorder,[27] most recent episode manic.  (Tr. 509).  Dr. Gonzalez indicated that plaintiff's current GAF score was 50, and that the highest GAF score plaintiff had had in the past year was a 50.  (Id.).  Plaintiff's medications were

---

[24]Presence of blood in the urine.  Stedman's at 864.

[25]Passage of bloody stools.  Stedman's at 862.

[26]Elevated levels of lipids in the blood plasma.  Stedman's at 922.

[27]An affective disorder characterized by the occurrence of alternating (e.g., mixed, manic, and major depressive) episodes.  Stedman's at 568.

listed as Haldol and Cogentin, and it was noted that these medications cause plaintiff to experience involuntary muscle spasms with his tongue and mouth. (Id.). Dr. Gonzalez indicated that plaintiff experiences thoughts of suicide, feelings of guilt or worthlessness, poverty of content of speech, mood disturbance, difficulty thinking or concentrating, hyperactivity, manic syndrome, auditory hallucinations, flight of ideas, loosening of associations, and racing thoughts. (Id.). Dr. Gonzalez expressed the opinion that plaintiff's abilities were seriously limited but not precluded in the following areas: carry out very short and simple instructions; maintain regular attendance and be punctual within customary, usually strict tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being unduly distracted; make simple work-related decisions; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to changes in a routine work setting; deal with normal work stress; be aware of normal hazards and take appropriate precautions; set realistic goals or make plans independently of others; deal with stress of semiskilled and skilled work; and travel in unfamiliar places. (Tr. 511-12). Dr. Gonzalez expressed the opinion that plaintiff was unable to meet competitive standards with regard to the ability to complete a normal work day and work week without interruptions from psychologically based symptoms. (Tr. 511). Dr. Gonzalez stated that plaintiff's insight and judgment overall is poor, and that plaintiff lacks focus and is easily distracted while being around others. (Id.). Dr. Gonzalez indicated that plaintiff was labeled as special needs during his school years and that he is very limited in reading and writing. (Tr. 512). Finally, Dr. Gonzalez stated that plaintiff has limited socialization and without medical compliance can be very unstable in his thinking. (Tr. 513).

In a psychosocial/clinical assessment dated February 12, 2009, Dr. Gonzalez noted that

plaintiff's thought process contained looseness of association, flight of ideas and racing. (Tr. 578). Dr. Gonzalez found that plaintiff's insight and judgment was overall poor. (Id.). Dr. Gonzalez diagnosed plaintiff with bipolar I disorder, most recent episode manic, unspecified; and assessed a GAF score of 50. (Tr. 579).

Plaintiff saw L. Lynn Mades, Ph.D., Licensed Psychologist, for a psychological examination on April 24, 2009. (Tr. 556-61). Dr. Mades diagnosed plaintiff with cocaine abuse, polysubstance dependence, and antisocial personality disorder, and assessed a GAF score of 75. (Tr. 560). Dr. Mades stated that, although plaintiff claimed to be bipolar, he reported little in the way of symptoms consistent with this and records note predominately problems with substance abuse and antisocial behavior, with possible substance-induced psychosis. (Id.). Dr. Mades stated that there was little in the way of records that would indicate psychosis or mood problems in the absence of substance use. (Tr. 561). Dr. Mades noted that no evidence of mood disturbance or thought disturbance was noted during the examination and there was evidence of a history of substance abuse and antisocial behavior by his history and presentation. (Id.). Dr. Mades administered intelligence testing, which revealed a Verbal IQ of 75, a Performance IQ of 89, and a Full Scale IQ of 79. (Tr. 559). Dr. Mades noted that these results place him in the borderline to low average range of cognitive functioning overall. (Id.). Dr. Mades found that plaintiff's prognosis was fair with appropriate intervention and abstinence from substance use. (Tr. 561). Dr. Mades expressed the opinion that plaintiff was capable of understanding the nature of the examination yet he was not competent to manage supplemental funds due to questions regarding his current substance use. (Id.).

## The ALJ's Determination

The ALJ made the following findings:

1.    The claimant has not engaged in substantial gainful activity since August 8, 2007, the application date (20 CFR 416.971 *et seq.*).

2.    The claimant has the following severe impairments: bipolar disorder, antisocial personality disorder and substance abuse disorder (20 CFR 416.920(c)).

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.925 and 416.926).

4.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant will require simple, repetitive work with only occasional interaction with co-workers, supervisors and the general public.

5.    The claimant has no past relevant work (20 CFR 416.965).

6.    The claimant was born on April 28, 1964 and was 43 years old, which is defined as a younger individual age 18-44, on the date the application was filed. (20 CFR 416.963).

7.    The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8.    Transferability of job skills is not an issue in this case because the claimant does not have past relevant work (20 CFR 416.968).

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

10.    The claimant has not been under a disability, as defined in the Social Security Act, since August 8, 2007, the date the application was filed (20 CFR 416.920(g)).

(Tr. 15-22).

The ALJ's final decision reads as follows:

Based on the application for supplemental security income protectively filed on August 8, 2007, the claimant is not disabled under section 1614(a)(3)(A) of the

Social Security Act.

(Tr. 23).

## Discussion

### A.     Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).   The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry."  Id.

### B.     The Determination of Disability

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can

be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a). The claimant has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c)), 416.920 (c)). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform

the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. See id. If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments. See 20 C.F.R. §§ 404.1520a (a), 416.920a (a). A special procedure must be followed at each level of administrative review. See id. Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required. See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758. Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council. See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the

determination of whether a mental impairment exists.  See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1).  If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2).  The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace.  See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3).  Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities.  See id.  Next, the Commissioner must determine the severity of the impairment based on those ratings.  See 20 C.F.R. §§ 404.1520a (c), 416.920a (c).  If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder.  See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).  This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders.  See id.  If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment.  See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

## C.     Plaintiff's Claims

Plaintiff first argues that the ALJ erred in failing to obtain vocational expert testimony that is consistent with the residual functional capacity formulated by the ALJ.  Plaintiff next argues that the ALJ erred in evaluating the medical opinion evidence in formulating plaintiff's residual functional capacity.  Plaintiff finally argues that the ALJ failed to properly consider third party evidence in determining plaintiff's residual functional capacity.  The undersigned will discuss

plaintiff's claims in turn, beginning with the ALJ's residual functional capacity determination.

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Similarly, in making a finding of residual functional capacity, an ALJ may consider non-medical evidence, although the residual functional capacity finding must be supported by *some* medical evidence. See Lauer, 245 F.3d at 704.

The ALJ made the following determination regarding plaintiff's residual functional capacity:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant will require simple, repetitive work with only occasional interaction with co-workers, supervisors and the general public.

(Tr. 19).

Plaintiff first argues that the ALJ erred in evaluating the opinions of treating physicians Drs. Gonzalez and Buchanan in formulating plaintiff's residual functional capacity. Plaintiff also contends that the ALJ failed to consider third party evidence.

In analyzing medical evidence, "[i]t is the ALJ's function to resolve conflicts among 'the

various treating and examining physicians.'" Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (quoting Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)). "Ordinarily, a treating physician's opinion should be given substantial weight." Rhodes v. Apfel, 40 F. Supp.2d 1108, 1119 (E.D. Mo. 1999) (quoting Metz v. Halala, 49 F.3d 374, 377 (8th Cir. 1995)). Further, a treating physician's opinion will typically be given controlling weight when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." Prosch v. Apfel, 201 F.3d 1010, 1012-1013 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527 (d)(2) (bracketed material in original). Such opinions, however, do "not automatically control, since the record must be evaluated as a whole." Id. at 1013 (quoting Bentley, 52 F.3d at 785-786). Opinions of treating physicians may be discounted or disregarded where other "medical assessments 'are supported by better or more thorough medical evidence.'" Id. (quoting Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997)).

There are six factors to be evaluated when weighing opinions of treating physicians: (1) the examining relationship; (2) the treatment relationship, including the length of the treatment relationship, the frequency of examination, and the nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors, e.g., "any factors [the claimant] bring[s] to [the ALJ's] attention" and "the extent to which an acceptable medical source is familiar with the other information in [the claimant's] case record." 20 C.F.R. §§ 404.1527(d)(1)-(6), 416.927(d)(1)-(6).

Plaintiff first argues that the ALJ should have assigned controlling weight to the opinion of treating physician Dr. Gonzalez. Plaintiff contends that the ALJ erred in failing to provide the weight given to Dr. Gonzalez's opinion.

- 35 -

Dr. Gonzalez, a psychiatrist at Hopewell Center, treated plaintiff approximately every two to three months from October 18, 2007, through December 2008. (Tr. 300, 509). On October 18, 2007, Dr. Gonzalez diagnosed plaintiff with polysubstance dependence, in remission; and bipolar disorder, most recent episode hypomanic; and assessed a current GAF score of 40. (Tr. 301). On December 30, 2008, Dr. Gonzalez completed a Mental Residual Functional Capacity Questionnaire, in which she indicated that plaintiff's current GAF score was 50 and that the highest GAF score he had had in the past year was a 50. (Tr. 509). Dr. Gonzalez expressed the opinion that plaintiff's abilities were seriously limited but not precluded in many areas, including carrying out very short and simple instructions, maintaining regular attendance and being punctual, sustaining an ordinary routine without special supervision, working in coordination with others without being unduly distracted, getting along with co-workers or peers without unduly distracting them, and dealing with normal work stress. (Tr. 511-12). Significantly, Dr. Gonzalez found that plaintiff was unable to meet competitive standards with regard to the ability to complete a normal work-day and work-week without interruptions from psychologically-based symptoms. (Tr. 511).

In his opinion, the ALJ cited some of the findings from Dr. Gonzalez's December 30, 2008 Mental Residual Functional Capacity Questionnaire. (Tr. 21). The ALJ then stated that "[m]edication non-compliance eroded [plaintiff's] ability to perform these tasks." (Id.). The ALJ did not indicate the weight he was assigning to Dr. Gonzalez's opinion. Dr. Gonzalez's opinion was much more restrictive than the residual functional capacity formulated by the ALJ.

The undersigned finds that the ALJ erred in evaluating the opinion of Dr. Gonzalez. First, the ALJ failed to indicate the weight he was assigning to the opinion of Dr. Gonzalez. Defendant

does not dispute that Dr. Gonzalez was plaintiff's treating psychiatrist. Whether the ALJ grants a treating physician substantial or little weight, the regulations require the ALJ to always give good reasons for the particular weight the ALJ chooses to give. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000). See 20 C.F.R. § 404.1527(d)(2).

Dr. Gonzalez treated plaintiff regularly for his psychiatric complaints, and her opinion is consistent with her treatment notes. Dr. Gonzalez noted on October 18, 2007, that plaintiff reported extreme mood swings, auditory hallucinations, and an inability to sleep at night. (Tr. 300). Dr. Gonzalez assessed a GAF score of 40 and prescribed Risperdal, Cogentin, and Trazodone. (Tr. 301). On December 30, 2008, Dr. Gonzalez indicated that plaintiff experienced thoughts of suicide, feelings of guilt or worthlessness, poverty of content of speech, mood disturbance, difficulty thinking or concentrating, hyperactivity, manic syndrome, auditory hallucinations, flight of ideas, loosening of associations, and racing thoughts. (Tr. 509). Dr. Gonzalez stated that plaintiff's insight and judgment were poor and that plaintiff lacks focus and is easily distracted while being around others. (Tr. 511). She also noted that plaintiff was labeled as special needs during his school years and that he is very limited in reading and writing. (Tr. 512). Dr. Gonzalez's opinion is supported by her own records and is also consistent with the record as a whole.

Further, the ALJ misstated a finding of Dr. Gonzalez. As previously noted, with respect to Dr. Gonzalez's December 30, 2008 findings, the ALJ stated "[m]edication non-compliance eroded [plaintiff's] ability to perform these tasks." (Tr. 21). Dr. Gonzalez actually stated that plaintiff "has limited socialization and without medical compliance can be very unstable in his thinking." (Tr. 513). Dr. Gonzalez , however, did not indicate the plaintiff's limitations resulted

from medication non-compliance as the ALJ suggests.

Plaintiff also argues that the ALJ erred in evaluating the opinion of Dr. Buchanan. Plaintiff contends that Dr. Buchanan is plaintiff's treating physician at Florence Hill Health Center. Defendant argues that Dr. Buchanan is not a treating physician.

Dr. Buchanan, a physician at Florence Hill Health Center, completed a Mental Residual Functional Capacity Questionnaire on November 10, 2007. (Tr. 311-15). Dr. Buchanan expressed the opinion that plaintiff was unable to meet competitive standards in the following areas: work in coordination with or proximity to others without being unduly distracted; complete a normal work day and work week without interruptions from psychologically based symptoms; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to changes in a routine work setting; deal with normal work stress; and deal with stress of semiskilled and skilled work. (Id.). Dr. Buchanan indicated that her opinion regarding plaintiff's limitations was based on plaintiff's chart history. (Id.).

The ALJ indicated that he was giving no weight to Dr. Buchanan's opinion, as it "does not address the function-by-function analysis required to form such an opinion, and is apparently unsupported by treatment records." (Tr. 21). The ALJ also noted that Dr. Buchanan did not even include a mental health diagnosis. (Id.).

The undersigned finds that the ALJ did not err in evaluating the opinion of Dr. Buchanan. First, as defendant points out, Dr. Buchanan is not a treating physician. There is no evidence in the record that Dr. Buchanan ever examined plaintiff. Rather, Dr. Buchanan indicates that her opinion regarding plaintiff's limitations is based on plaintiff's "chart history." (Tr. 313). There is also no evidence that Dr. Buchanan is a psychiatrist or psychologist. In fact, Dr. Buchanan notes

in two different places on the questionnaire "defer to psychiatrist opinion," and "defer to psychiatrist." (Tr. 311, 315). As such, the ALJ provided sufficient reasons for assigning no weight to Dr. Buchanan's opinion.

Plaintiff finally argues that the ALJ failed to properly consider third party evidence in determining plaintiff's residual functional capacity. Specifically, plaintiff contends that the ALJ should have considered the opinion of Mark Goens, plaintiff's social worker. Plaintiff argues that, instead of considering Mr. Goens's testimony as third party evidence based on Mr. Goens's training and regular contact with plaintiff, the ALJ improperly rejected it as a medical opinion.

The ALJ noted that Mr. Goens, plaintiff's community support worker, testified at the original administrative hearing and the supplemental hearing. (Tr. 20). The ALJ discussed some of Mr. Goens's testimony, including Mr. Goens's opinion that plaintiff was unable to function on his own. (Id.). The ALJ stated that Mr. Goens's opinion was unsupported by any medical evidence.

Under SSA regulations, Mr. Goens is not a "medical source," but is considered an "other source." See 20 C.F.R. § 416.913(d). In determining what weight to give "other medical evidence," the ALJ has more discretion and is permitted to consider any inconsistencies found within the record. Raney v. Barnhart, 396 F.3d 1007, 1010 (8th Cir. 2005). See 20 C.F.R. § 416.927(d)(4).

The ALJ did not err in evaluating the opinion of Mr. Goens. The ALJ discussed Mr. Goens's testimony and considered this evidence in determining the severity of plaintiff's impairments. The ALJ concluded that Mr. Goens's opinion that plaintiff was unable to function on his own was unsupported by the medical record. It is true that none of plaintiff's treating

mental health professionals suggested that plaintiff was incapable of functioning independently.

In sum, because the ALJ failed to explain the weight given to the opinion of plaintiff's treating psychiatrist, Dr. Gonzalez, the decision is not supported by substantial evidence on the record as a whole. Dr. Gonzalez found that plaintiff had significant work-related limitations, which the ALJ did not incorporate into plaintiff's residual functional capacity. The ALJ did not articulate how Dr. Gonzalez's opinion was inconsistent with the medical record. Notably, the only medical opinion to which the ALJ assigned "some weight," was the opinion of a non-examining state agency medical consultant, Dr. DeVore. (Tr. 21). As such, the ALJ's mental residual functional capacity determination is not supported by substantial evidence.

Accordingly, the undersigned recommends that this matter be reversed and remanded to the ALJ in order for the ALJ to properly evaluate the opinion of plaintiff's treating physician, Dr. Gonzalez; formulate a new residual functional capacity for plaintiff based on the medical evidence in the record; and then to continue with the next steps of the sequential evaluation process.

## **RECOMMENDATION**

**IT IS HEREBY RECOMMENDED** that, pursuant to sentence four of 42 U.S.C. § 405 (g), the decision of the Commissioner be **reversed** and this case be **remanded** to the Commissioner for further proceedings consistent with this Report and Recommendation.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636 (b) (1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

Dated this  1st  day of March, 2011.

Lewis M. Blanton
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE